<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

```
RAFIEEK GRAHAM, et al.,          :
                                 :  Civil Action No. 11-7125 (SRC)
              Plaintiffs,        :
                                 :
                                 :
              v.                 :    **OPINION**
                                 :
JACYLEN OTTINO, et al.,           :
                                 :
              Defendants.        :
```

**APPEARANCES:**

     RAFIEEK GRAHAM, Plaintiff <u>pro</u> <u>se</u>
     #000083
     East Jersey State Prison, Special Treatment Unit
     CN 905, 8 Production Way
     Avenel, New Jersey 07001

     THADDEUS THOMAS, Plaintiff <u>pro</u> <u>se</u>
     #000114
     East Jersey State Prison, Special Treatment Unit
     CN 905, 8 Production Way
     Avenel, New Jersey 07001

**CHESLER**, District Judge

     Plaintiffs, Rafieek Graham and Thaddeus Thomas, involuntarily committed persons pursuant to the Sexually Violent Predator Act ("SVPA"), <u>N.J.S.A.</u> 30:4-27.24, <u>et</u> <u>seq</u>., seek to bring this action <u>in</u> <u>forma</u> <u>pauperis</u>. Based on their separate affidavits of indigence, the Court will grant plaintiffs' applications to proceed <u>in</u> <u>forma</u> <u>pauperis</u> ("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the Clerk of the Court to file this Complaint accordingly.

At this time, the Court must review the Complaint and
plaintiffs' numerous addendums, pursuant to 28 U.S.C.
§ 1915(e)(2), to determine whether the action should be dismissed
as frivolous or malicious, for failure to state a claim upon
which relief may be granted, or because it seeks monetary relief
from a defendant who is immune from such relief.  For the reasons
set forth below, the Court concludes that this action should
proceed in part.

## I.   BACKGROUND

Plaintiffs bring this civil rights action, pursuant to 42
U.S.C. § 1983, against the following defendants: Jacylen Ottino,
Program Coordinator at the East Jersey State Prison, Special
Treatment Unit ("EJSP-STU"); Shantay Brame Adams, Assistant Unit
Director at the EJSP-STU; Merril Main, Clinical Director of the
EJSP-STU; Roxanne Vega, Treatment Therapist at EJSP-STU; Kevin
Enright, Therapist at EJSP-STU; Steven Johnson, Assistant
Superintendent at the EJSP-STU; Yvette Corniel, Program
Coordinator at the EJSP STU; and Dr. Robert Carson, Therapist at
the EJSP-STU.  (Complaint, Caption and ¶¶ 4b-4i).  The following
factual allegations are taken from the Complaint and numerous
addendums,[1] and are accepted for purposes of this screening only.

-------

[1]   Plaintiffs have inundated the Court with "addendums" to
their Complaint as follows: on December 14, 2011 (docket entry
no. 2); December 19, 2011 (docket entry no. 3); December 22, 2011
(docket entry no. 4); December 21, 2011 (docket entry no. 5);
December 21, 2011 (docket entry no. 6); December 27, 2011 (docket

The Court has made no findings as to the veracity of Plaintiffs' allegations.

The Court notes that this is the fifth action filed by Plaintiff Graham with regard to his civil confinement at the STU in EJSP. His prior actions have been dismissed for failure to state a claim. This is the second action filed by Plaintiff Thomas. Thomas has an earlier related action, <u>Thomas v. Adams, et al.</u>, Civil No. 10-5026 (DRD), that is presently proceeding before the Honorable Dickinson R. Debevoise, U.S.D.J., concerning the conditions of his civil confinement at the EJSP-STU.

At the outset, the Court observes that the Complaint and addendums appear to have been handwritten by several different persons and that the pleadings are disjointed, chronologically incoherent and interspersed with legal argument, which makes the required screening of this action a very arduous task for the Court. Moreover, Plaintiffs' inexorable addendums exacerbate the screening process. Nevertheless, the Court has distilled the factual allegations as follows.

---

entry no. 7); December 28, 2011 (docket entry no. 8); December 30, 2011 (docket entry no. 9); January 6, 2012 (docket entry no. 10); January 6, 2012 (docket entry no. 11); January 13, 2012 (docket entry nos. 15, 16, and 17); January 20, 2012 (docket entry nos. 12, 13 and 14); January 31, 2012 (docket entry no. 18); February 6, 2012 (docket entry no. 19); March 14, 2012 (docket entry no. 20); March 29, 2012 (docket entry no. 21); May 10, 2012 (docket entry no. 22); May 21, 2012 (docket entry no. 23); May 25, 2012 (docket entry no. 24); June 11, 2012 (docket entry no. 25); and June 22, 2012 (docket entry no. 26).

Plaintiffs allege that, on December 30, 2010 and January 3, 2011, Plaintiff Thomas informed defendants Ottino and Adams that another resident (Anthony Hardin) at the EJSP-STU on "strong psychotic medication [is] threatening to shed [Plaintiffs'] blood." Plaintiffs allege that they repeatedly informed staff that resident Hardin was threatening them. On November 14, 2011, while in the annex yard, Hardin became verbally and physically aggressive with Plaintiffs. To break up the physical altercation, SCO Cerrone, SCO Nacca and SCO Castro allegedly threw Plaintiffs to the ground, kneeing Plaintiff Thomas in the rib cage while handcuffed and dragging Plaintiff Graham along the ground causing his skin to abrade from his head. Plaintiffs thereafter were placed in lock-up and MAP status, with no personal belongings, T.V., and radio, limited recreation time, and no treatment or therapy.

Plaintiffs had complained to defendants Johnson, Ottino, and Dr. Friedman about their restrictive conditions, emphasizing that they had repeatedly warned staff about the threats from Hardin, which were ignored until Hardin attacked them on November 14, 2011. It was explained to Plaintiffs that they could have avoided Hardin and removed themselves from the situation. Hardin was placed back in general population while Plaintiffs remain in MAP lock-up.

Plaintiffs have submitted statements from other residents who had witnessed Hardin's attack.  A statement by Roy L. Marcum, dated December 6, 2011, also was attached to Docket entry no. 2-1, which stated that Dr. Carlson told Plaintiff Thomas that both Thomas and Graham had physically assaulted Hardin, had planned it, and were now evading responsibility for their actions.

Also attached to an addendum to the Complaint, at docket entry no. 2-1, is an Interoffice Communication memo, dated November 15, 2011, from defendant Johnson to Program Coordinator R. Van Pelt, regarding Plaintiff Thomas and his placement on Tier MAP as a result of the November 14, 2011 incident.  The memo states:

> On November 14, 2011, resident Thomas was placed in TCC as a result of having a physical altercation with another resident, AH #320.  An Initial MAP Placement Review was conducted by two members of DHS Treatment Team with Mr. Thomas today.  He demonstrated behavioral stability and gave reasonable assurance that he does not pose an assault risk to himself or others.  Mr. Thomas indicated that he was provoked by AH and admitted that, along with resident RG #083, he physically retaliated against AH.  When questioned about specifics, Mr. Thomas said that he could not recall who threw the first punch.  He commented that resident AH has provoked him on more than one occasion in the past.
>
> It has been determined by the DHS Treatment Team, that upon release from TCC, Mr. Thomas will be placed on Tier MAP. Due to his involvement with resident RG in this incident, it is imperative that they are placed on separate housing units.  Mr. Thomas has been encouraged to attend MAP Group 2 (Tuesdays @ 2:30 pm) to process his behavior in order to better manage it in the future.  Additionally, he has been advised to discuss his MAP placement issues with DHS personnel during weekly MAP rounds.  The following restrictions will be in place for Mr. Thomas when released from TCC:

```
* Movement limited to the Tier MAP side of the South housing
    unit
* No Job
* No television
* No CD player or CDs
* No DVD player or DVDs
* No video game system or video games
```

The Treatment Team will monitor and assess Mr. Thomas on an ongoing basis; any new recommendations concerning his MAP placement will be made accordingly.

Both Plaintiffs complain that these restrictions, especially their separation from each other, make them feel "mentally punished."  Thomas alleges that Graham is his "mental support" and has been for ten years.

Thomas alleges that on December 6, 2011, the South Unit officer told him he was not permitted in that MAP group session. On December 8, 2011, SCO R.E. Rembert told Thomas that Thomas was supposed to have MAP group on Tuesdays at 2:30 p.m.  Thomas complains that this restriction causes him "to be more/even more isolated on tier."

Plaintiff Graham alleges that while he was waiting for medical attention after the November 14, 2011 altercation with Hardin, he overheard officers praising Hardin for "getting" Plaintiffs.  He complains that when they were taken to the lock-up tier, he and Thomas were placed in separate cells so they could not communicate with each other.  Graham complains that he is still being kept separate from Thomas.

In a second addendum, (docket entry no. 3), Graham alleges that on December 12, 2011, he was stopped on his way to the mailbox to mail his addendums to this action, and was told that defendants Ottino, Adams and Main gave orders that Plaintiff was not allowed to go to the mailbox because he was on high extreme alert close watch due to a physical altercation that could have been prevented.[2]  Thomas continues to complain that he is being kept separate from Graham and they have been kept idle for a month after the November 14, 2011 altercation.  Plaintiffs also were told that they could not participate in holiday recreational activities.

Plaintiffs wrote to the Court on December 15, 2011 (docket entry no. 4) alleging that "(1) we are being sexually harassed because of our gender in life, (2) we are being discriminated against because of our lifestyle, (3) we are being kept away from each other, after over 10 years of being in as well as on each others lives and side, in retaliation. (4) and is seriously being retaliated against, due to the lawsuit, and also mentally harassed by correction officers."

In a letter dated December 8, 2011 (docket entry no. 5) Graham alleges that he and Thomas are being denied their paperwork regarding their MAP status.  Graham also alleges that

---

[2]  The Court can hardly construe this allegation as an interference with the mail claim or denial of access to the courts claim as both Plaintiffs virtually have inundated the Court with mailings and addendums to their civil actions before this Court on almost a daily basis for several months.

he is being closely watched to see if he engages in sexual
activities with other residents on West Unit, which he would
never do.  Graham states that he wants to be in the South Unit
with Thomas.  Thomas alleges essentially the same complaints in a
letter dated December 17, 2011 (docket entry no. 6).

On December 24, 2011, Graham filed a motion to amend his
Complaint to add SCO M. Kimball as a defendant.  He alleges that
Kimball has told Graham to associate with other residents on the
West Unit and forget about his "only mental supporter" Thomas,
who is in lock-up in the South Unit.  Kimball also allegedly told
Graham that he can engage in sexual activities with other
residents on West Unit.  (Docket entry no. 8).  Graham relates a
similar incident where another resident "Austin" was told to
engage Graham in sexual activities.  Graham states that he has to
stay in view of the officers so that it won't be reported to
Thomas that Graham is being "disloyal" to him by engaging in
sexual activities with others.  Graham states that "[t]hey all
know that I will only be that close to Thaddeus Thomas #114/no
one else."  (Docket entry no. 9).  Graham attaches a Treatment
Refusal form, dated October 8, 2010, which shows that Graham has
failed to comply with recommendations for treatment and is
strongly encouraged to resume attending his scheduled Process
Group.  (Id.).  Graham also attaches an Inter-Office
Communication from defendant Johnson, dated December 22, 2011,
stating that Graham was prohibited from attending MAP Group until

8

further notice "because he walked out of MAP group on December 20, 2011 before its completion and was disruptive to the group both while making his departure and subsequent to him walking out.  Until he is instructed otherwise, Mr. Graham must utilize MAP Rounds for his MAP Group issues."  (Id.).

In other addendums to the Complaint, Graham alleges that during January 2012, he received only cursory MAP rounds, and remains idle with no treatment.  (Docket entry nos. 12 and 15).  In an addendum filed by Thomas, he relates that he and Graham have not had any yard time for two weeks in January 2012.  (Docket entry no. 13).

Most of the addendums filed by Plaintiffs reiterate the same complaints and do not assert any new claims.  In addendums Docket entry nos. 21 and 22, Plaintiffs complain about the medical treatment received by other residents who later died.  These complaints are unrelated and irrelevant to either Plaintiff.

Finally, on June 7, 2012, Plaintiffs complain that the restrictions and confinement on MAP status are still in place.  (Docket entry no. 25).

This Court observes that both Plaintiffs have filed several actions relating to their confinement at EJSP-STU.  For instance, Graham has filed the following actions: Graham v. Christie, et al., Civil No. 10-2010 (KSH); Graham v. Main, et al., Civil No. 10-5027 (SRC); and Graham v. Sharp, et al., Civil No. 10-5563 (SRC), which were dismissed without prejudice for failure to

state a claim for relief, pursuant to 28 U.S.C. §
1915(e)(2)(B)(ii).  In a more recent action, Graham v. Corniel,
et al., Civil No. 11-3784 (SRC), Graham filed a complaint
alleging that he is being denied treatment and that the actions
by defendants in that matter are in retaliation for Graham filing
lawsuits and grievances.  As to Thomas, he has a pending lawsuit,
Thomas v. Adams, et al., Civil No. 10-5026 (DRD), alleging that
he is being denied treatment in violation of his constitutional
rights.  Finally, both Plaintiffs have filed another later
action, Thomas, et al. v. Fratalone, et al., Civil No. 12-184
(ES).

## II.   STANDARDS FOR A SUA SPONTE DISMISSAL

A district court is required to review a complaint in a
civil action where the litigant is proceeding in forma pauperis.
Specifically, the court is required to identify cognizable claims
and to sua sponte dismiss any claim that is frivolous, malicious,
fails to state a claim upon which relief may be granted, or seeks
monetary relief from a defendant who is immune from such relief,
pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because
Plaintiffs are proceeding in forma pauperis in this matter, this
action is subject to sua sponte screening for dismissal under 28
U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the
Court must be mindful to construe it liberally in favor of the
plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007)

(following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>see also</u> <u>United States v. Day</u>, 969 F.2d 39, 42 (3d Cir. 1992).

    The Supreme Court refined the standard for summary dismissal of a complaint that fails to state a claim in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  <u>Fed.R.Civ.P.</u> 8(a)(2). Citing its opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555), the Supreme Court held that, to prevent a summary dismissal, a civil complaint must now allege "sufficient factual matter" to show that the claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203 (3d Cir. 2009)(citing <u>Iqbal</u>, 556 U.S. at 676). The Supreme Court's ruling in <u>Iqbal</u> emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible. <u>See</u> <u>id</u>. at 678-79; <u>see</u> <u>also</u> <u>Twombly</u>, 505 U.S. at 555, & n. 3; <u>Warren Gen. Hosp.</u> <u>v.. Amgen Inc.</u>, 643 F.3d 77, 84 (3d Cir. 2011). "A complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts."

Fowler, 578 F.3d at 211 (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008).  See also Argueta v. .S Immigration & Customs Enforcement, 643 F.3d 60, 73 (3d Cir. 2011); Bistrian v. Levi, __ F.3d __, 2012 WL 4335958, *8 (3d Cir. Sept. 24, 2012)(allegations that are no more than conclusions are not entitled to the assumption of truth; a court should "look for well-pled factual allegations, assume their veracity, and then 'determine whether they plausibly give rise to an entitlement to relief.'")(quoting, Iqbal, 556 U.S. at 679).

### III.  SECTION 1983 ACTIONS

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

IV.  THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT

The New Jersey SVPA, N.J.S.A. 30:4-27.24 *et seq.*, provides
for the custody, care and treatment of involuntarily committed
persons who are deemed to be sexually violent predators ("SVP").
N.J.S.A. 30:4-27.26.  The New Jersey Department of Corrections
("DOC") operates the facilities designated for SVPs, N.J.S.A.
30:4-27.34(a); and the New Jersey Department of Human Services
("DHS") provides for their treatment.  N.J.S.A. 30:4-27.34(b).
The SVPA was amended in 2003 to require that regulations be
promulgated jointly by the DOC and the DHS, in consultation with
of the Attorney General, taking "into consideration the rights of
the patients as set forth in section ten of P.L. 1965, c. 59 (C.
30:4-24.2) ... [to] specifically address the differing needs and
specific characteristics of, and treatment protocols related to,
sexually violent predators."  N.J.S.A. 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made
specific findings regarding SVPs.  N.J.S.A. 30:4-27.25.  The
Legislature noted that it was necessary to modify the previous
civil commitment framework and additionally separate SVPs from
other persons who have been civilly committed.  Id.  The SVPA
defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent
> or found not guilty by reason of insanity for commission of
> a sexually violent offense, or has been charged with a
> sexually violent offense but found to be incompetent to
> stand trial, and suffers from a mental abnormality or
> personality disorder that makes the person likely to engage
> in acts of sexual violence if not confined in a secure
> facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings.  N.J.S.A. 30:4-27.35.  A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge.  N.J.S.A. 30:4-27.36.

V.  <u>ANALYSIS</u>

A.  <u>Failure to Protect Claim</u>

It would appear that Plaintiffs may be asserting a claim that defendants Ottino and Adams failed to protect them from harm by another resident despite Plaintiffs having given defendants prior notice of the impending danger.  Under the Eighth Amendment's Cruel and Unusual Punishment Clause, prison officials have "a duty to protect prisoners from violence at the hands of other prisoners."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994)(quotation marks omitted); <u>see also</u> <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 130-33 (3d Cir. 2001); <u>Hamilton v. Leavy</u>, 117 F.3d 742, 746 (3d Cir. 1997).  However, as Plaintiffs are not convicted or sentenced prisoners, but civilly committed SVPs, this claim must be examined under the Fourteenth Amendment.  <u>See</u> <u>Bistrian v. Levi</u>, __ F.3d __, 2012 WL 4335958, *9 (3d Cir. Sept. 24, 2012)(citing <u>Graham v. Connor</u>, 490 U.S. 386, 392 n.6 (1989)); <u>see also</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 n.16 (1979); <u>Hubbard v. Taylor</u>, 399 F.3d 150, 164 (3d Cir. 2005)(hereinafter "Hubbard I"); <u>Fuentes v. Wagner</u>, 206 F.3d 335, 341-42 (3d Cir. 2000).

In Bistrian, the Court of Appeals for the Third Circuit "recognized that an unsentenced inmate may bring a due process-grounded failure-to-protect claim of the sort that a sentenced inmate can bring under the Eighth Amendment." 2012 WL 4335958 at *9. The Third Circuit stated that "it is well established that, under the Constitution's guarantees of due process, an unsentenced inmate "is entitled[,] at a minimum, to no less protection than a sentenced inmate is entitled to under the Eighth Amendment." Id. (quoting Fuentes, 206 F.3d at 344 (quotation marks and alterations omitted)). Therefore, Plaintiffs have a clearly established constitutional right to have prison officials protect them from inmate or resident violence. Moreover, while pretrial detainees and SVPs are, at least, on equal footing with convicted and sentenced prisoners when they assert a claim that prison officials failed to protect them from harm by other inmates or residents, they have an "indisputable advantage when they claim that they were unconstitutionally punished." Bistrian, 2012 WL 4335958 at *20 n. 8 (citing Bell, 441 U.S. at 535 n.16 ("Due process requires that a pretrial detainee not be punished.")).

Not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. To state a claim for damages against a prison official for failure to protect from inmate violence, an inmate must plead

15

facts that show (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm.  Id. at 834; Hamilton, 117 F.3d at 746.

"Deliberate indifference" in this context is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Beers–Capitol, 256 F.3d 120 at 125.  It is not sufficient that the official should have known of the risk.  Id. at 133.  A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety "in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842.  In other words, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

Prison officials may escape liability for deliberate indifference claims in several ways.  They "might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability

16

if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id.  "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable" on a failure-to-protect claim. Id. at 845; see also Hamilton, 117 F.3d at 746 (noting that prison officials have "a duty ... to take reasonable measures to protect prisoners from violence at the hands of other prisoners") (quotation marks omitted).

Based on the factual allegations pled in the Complaint, if true, this Court concludes that Plaintiffs may have articulated a plausible failure-to-protect claim against defendants Ottino and Adams.  Plaintiffs allege that they had repeatedly warned these defendants by written notice that the resident had threatened to harm them.  Despite these warnings, Plaintiffs were placed in the same annex yard at the same time as the threatening resident, exposing Plaintiffs to potential harm.  These factual allegations suggest that these defendants may have deliberately placed Plaintiffs in a vulnerable position that posed a substantial risk of serious harm to Plaintiffs.

Thus, affording Plaintiffs all reasonable inferences from their allegations and construing them in the light most favorable to them, as this Court is obligated to do at this preliminary screening, this Court finds that Plaintiffs have alleged a plausible claim that defendants Ottino and Adams may have violated their constitutional duty to protect Plaintiff from

17

inmate/resident violence by being deliberately indifferent to the risk posed by the other resident after having been warned that the resident had threatened harm to Plaintiffs.

B.  <u>Excessive Force Claim</u>

Next, it would appear from the Complaint and addendums that Plaintiffs are alleging a claim of unconstitutional excessive force used by defendants, SCO Cerrone, SCO Nacca, and SCO Castro. These defendants allegedly used excessive force in breaking up the physical altercation between Plaintiffs and the resident Hardin.  Plaintiffs allege that these defendants threw Plaintiffs to the ground, kneed Plaintiff Thomas in the rib cage, and dragged Plaintiff Graham along the ground abrading the skin from his head.

As stated above, SVPs are protected by the Due Process Clause of the Fourteenth Amendment.  Analysis of whether a detainee, un-sentenced prisoner, or SVP has been deprived of liberty without due process is governed by the standards set out by the Supreme Court in <u>Bell</u>, 441 U.S. 520; <u>Fuentes</u>, 206 F.3d at 341-42.  In <u>Bell</u>, the Supreme Court stated:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee.  For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law....
>
> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense,

18

however.  Once the government has exercised its conceded
authority to detain a person pending trial, it obviously
is entitled to employ devices that are calculated to
effectuate this detention....

A court must decide whether the disability is imposed for
the purpose of punishment or whether it is but an
incident of some other legitimate governmental purpose.
Absent a showing of an expressed intent to punish on the
part of detention facility officials, that determination
generally will turn on "whether an alternative purpose to
which [the restriction] may rationally be connected is
assignable for it, and whether it appears excessive in
relation to the alternative purpose assigned [to it]."
Thus, if a particular condition or restriction of
pretrial detention is reasonably related to a legitimate
governmental objective, it does not, without more, amount
to "punishment."  Conversely, if a restriction or
condition is not reasonably related to a legitimate
goal-if it is arbitrary or purposeless-a court
permissibly may infer that the purpose of the
governmental action is punishment that may not
constitutionally be inflicted upon detainees qua
detainees....

Bell, 441 U.S. at 535-39 (citations omitted).  The Court further

explained that the government has legitimate interests that stem

from its need to maintain security and order at the detention

facility.  "Restraints that are reasonably related to the

institution's interest in maintaining jail security do not,

without more, constitute unconstitutional punishment, even if

they are discomforting and are restrictions that the detainee

would not have experienced had he been released while awaiting

trial."  Id. at 540.  Retribution and deterrence, however, are

not legitimate nonpunitive governmental objectives.  Id. at 539

n. 20.  Nor are grossly exaggerated responses to genuine security

considerations.  Id. at 539 n. 20, 561-62.

19

Under this standard, Plaintiffs may have adequately alleged that these named defendants used excessive force against them in violation of their constitutional rights.  The allegations may support a claim that Plaintiffs were maliciously dragged and beaten in response to a physical altercation started by another resident for the sole purpose of causing them pain and punishing the Plaintiffs.  There are no allegations that Plaintiffs were attacking the defendants or others that would necessitate this use of force, especially while they were handcuffed.  Under these circumstances, if true, Plaintiffs may be able to prove that actions of these defendants were a grossly exaggerated response and were intended as punishment.  Therefore, the excessive force claim, based on the Due Process Clause of the Fourteenth Amendment, will be allowed to proceed past the sua sponte screening stage at this time as against defendants, SCO Cerrone, SCO Nacca and SCO Castro.

C.   Punitive Detention/MAP Status

Next, Plaintiffs complain that they have been placed on MAP status with very restrictive conditions, and separated from each other in response to the physical altercation that had occurred between Plaintiffs and resident Hardin.  These restrictions include no job, no television, no CD or DVD player, no video games or game system, and assignment to separate MAP tiers and treatment and therapy groups away from each other.  Plaintiffs complain that these restrictions are "mentally" punitive.

20

The Due Process Clause of the Fourteenth Amendment prohibits punishment of a pretrial detainee prior to an adjudication of guilt in accordance with due process of law.  See Bell, 441 U.S. at 535; Hubbard I, 399 F.3d at 166.[3]  This standard also applies to Plaintiffs as they are SVPs and not convicted and/or sentenced prisoners.  See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, Bell, 441 U.S. at 536,[4] within the bounds of professional discretion, Youngberg, 457 U.S. at 321-22. Specifically, in Youngberg, the Supreme Court held that civilly committed persons do have constitutionally protected interests,

---

[3]  "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.  Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." Bell v. Wolfish, 441 U.S. at 537, n. 16 (quoting Ingraham v. Wright, 430 U.S. 651, 671-72, n. 40 (1977)); see also City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983).

[4]  In Bell v. Wolfish, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose.  441 U.S. 520, 535-39, (1979).

but that these rights must be balanced against the reasons put
forth by the State for restricting their liberties. Id. at 307.
The Constitution is not concerned with de minimis restrictions on
patients' liberties. Id. at 320. Moreover, "due process
requires that the conditions and duration of confinement [for
civilly confined persons] bear some reasonable relation to the
purpose for which persons are committed." Seling, 531 U.S. at
265. While the nature of an SVP's confinement may factor in this
balance of what is reasonable, it is clearly established that the
substantive due process protections of the Fourteenth Amendment
apply to SVPs. See Andrews v. Neer, 253 F.3d 1052, 1061 (8th
Cir. 2001)(applying the Fourteenth Amendment's "objective
reasonableness" standard to excessive force claims brought by
civilly committed SVPs).

    Further, as the Supreme Court explained the objective
reasonableness test of the Fourteenth Amendment,

    [I]f a particular condition or restriction of pretrial
    detention is reasonably related to a legitimate governmental
    objective, it does not, without more, amount to
    "punishment." Conversely, if a restriction or condition is
    not reasonably related to a legitimate goal-if it is
    arbitrary or purposeless-a court permissibly may infer that
    the purpose of the governmental action is punishment that
    may not constitutionally be inflicted upon detainees qua
    detainees.

Bell, 441 U.S. at 539 (footnote and citation omitted).

    The Supreme Court noted that the maintenance of security,
internal order, and discipline are essential goals which at times
require "limitation or retraction of ... retained constitutional

rights." Bell, 411 U.S. at 546.  "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." Id. at 540.  "In assessing whether the conditions are reasonably related to the assigned purposes, [a court] must further inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them." Hubbard, 399 F.3d at 159 (quoting Union County Jail Inmates v. DiBuono, 713 F.2d 984, 992 (3d Cir. 1983)).

The Court of Appeals for the Third Circuit summarized the holding of Bell as follows:

> [A] particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose.

Stevenson v. Carroll, 495 F.3d 62, 68 (3d Cir. 2007)(citation and internal quotation marks omitted).  Moreover, the Third Circuit "distilled the Supreme Court's teachings in Bell into a two-part test.  "We must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." Hubbard, 538 F.3d at

232 (citation and internal quotation marks omitted).  The Court

of Appeals further explained that the Fourteenth Amendment

standard of unconstitutional punishment, like the Eighth

Amendment's cruel and unusual punishments standard, contains an

objective component, as well as a subjective component:

> Unconstitutional punishment typically includes both
> objective and subjective components.  As the Supreme Court
> explained in Wilson v. Seiter, 501 U.S. 294 [](1991), the
> objective component requires an inquiry into whether "the
> deprivation [was] sufficiently serious" and the subjective
> component asks whether "the officials act[ed] with a
> sufficiently culpable state of mind[.]"  Id. at 298 ....
> The Supreme Court did not abandon this bipartite analysis in
> Bell, but rather allowed for an inference of mens rea where
> the restriction is arbitrary or purposeless, or where the
> restriction is excessive, even if it would accomplish a
> legitimate governmental objective.

Stevenson, 495 F.3d at 68.  See also Bistrian, 2012 WL 4335958 at

*15-16.

Pertinent here as well, the Third Circuit has held that

placement of a civilly committed SVP in segregated confinement

does not violate due process unless the deprivation of liberty is

in some way extreme.  See Deavers v. Santiago, 243 Fed. Appx.

719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515 U.S. 472

(1995),[5] to segregated confinement of civilly committed SVPs).

See also Thielman v. Leean, 282 F.3d 478 (7th Cir. 2002)(likewise

extending Sandin to civil commitment settings).

_____

[5]  In Sandin, the Supreme Court held that there was no
cognizable liberty interest in freedom from additional restraint
in a prison setting.  See 515 U.S. at 486 ("We hold that [the
prisoner's] discipline in segregated confinement did not present
the type of atypical, significant deprivation in which a State
might conceivably create a liberty interest.").

Here, Plaintiffs admit by documentation filed with their addendums that their placement in segregated confinement was due to their mutual involvement in the physical altercation with resident Hardin.  In fact, there is evidence that Plaintiffs may have been the ones to initiate the physical altercation in the annex yard.  Further, there is no restriction on group therapy, only that the Plaintiffs must be segregated from each other in group.  This separation from each other seems to be the overarching concern of Plaintiffs.[6]  Consequently, Plaintiffs' allegations of a restrictive and punitive detention, in light of the evidence shown in their pleading attachments, do not raise a reasonable inference that their segregated detention is excessive in light of the legitimate non-punitive government purpose for this segregation from each other.  Moreover, Plaintiffs do not allege that this segregation was imposed without violation of their procedural due process right to an explanation and opportunity to challenge the continued MAP status.  Finally, Plaintiffs have provided documentation with this action that shows their extended segregation on the MAP tier is based on their continuing refusal to cooperate in group treatment.  Therefore, this claim will be dismissed without prejudice for failure to state a claim at this time.

---

[6]  The only other restrictions seem to be a proscription against TV, DVDs, CDs and video game systems.  It is not clear that these restrictions are still in place.

D. <u>Retaliation</u>

Plaintiffs also appear to allege that they are being kept apart from one another in separate MAP tiers in retaliation for filing lawsuits.  "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution ... ."  <u>White v. Napoleon</u>, 897 F.2d 103, 111-12 (3d Cir. 1990); <u>see also</u> <u>Bistrian</u>, 2012 WL 4335958 at *18; <u>Mitchell v. Horn</u>, 318 F.3d 523, 529-31 (3d Cir. 2003); <u>Rauser v. Horn</u>, 241 F.3d 330, 333-34 (3d Cir. 2001); <u>Allah v. Seiverling</u>, 229 F.3d 220, 224-26 (3 Cir. 2000).  To prevail on a retaliation claim, plaintiff must demonstrate that (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action.  <u>Rauser</u>, 241 F.3d at 333 (3d Cir. 2001)(quoting <u>Allah</u>, 229 F.3d at 225.

The plausibilty of Plaintiffs' allegation as to the first factor can not be disputed as Plaintiffs have engaged in the filing of civil complaints in federal court concerning the conditions of their civil commitments.  However, Plaintiffs fail to allege facts sufficient to create a plausible inference that their confinement to MAP status and separation from each other was a retaliatory response to their filing lawsuits.  Namely, the

allegations and documents show that the adverse action or placement on MAP status was in actual response to their continued non-cooperation and due to the physical altercation that they may have initiated or at least exacerbated with resident Hardin,[7] not the filing of their lawsuits, which have been filed and/or maintained since 2010, long before application of MAP status. Therefore, this retaliation claim will be dismissed without prejudice for failure to state a claim at this time.

E.  Sexual Harassment and Discrimination

Next, Plaintiffs generally allege that they are "being sexually harassed because of [their] gender in life," and that they are "being discriminated against because of [their] lifestyle."  Plaintiffs provide no factual support for these general allegations other than that they are being kept apart. However, this separation has been shown to be based on legitimate disciplinary reasons and not for harassment or discriminatory purposes.  At most, Plaintiffs allege that defendant Kimball has attempted to convince Graham to engage in sexual activities with another resident and encouraged other residents to get close to Plaintiff.  This single, unsupported allegation does not give rise to a sexual harassment and discrimination claim.

---

[7]  Indeed, Plaintiffs have had lawsuits initiated long before they were placed on separate MAP tiers, and they were not placed on MAP status until after the physical altercation with resident Hardin had occurred.

Based on these limited and unsupported allegations, Plaintiffs have failed to allege plausible facts to give rise to an entitlement to relief on these claims, and accordingly, these claims will be dismissed without prejudice at this time. See Iqbal, 556 U.S. at 679.

F.   Denial of Treatment

This Court also observes that both Plaintiffs have ongoing actions that allege they are being denied therapy and treatment. To the extent that Plaintiffs are pursuing a denial of treatment claim in violation of their due process rights, then such claim should be made part of their earlier pending actions for similar relief, namely, Graham v. Corniel, et al., Civil No. 11-3784 (SRC) and Thomas v. Adams, et al., Civil No. 10-5026 (DRD).  The better course for Plaintiffs in this regard is to file amended pleadings to allege any additional facts supporting these claims in their respective, earlier-pending actions.

G.   Amendment - Harassment Claim

On or about June 22, 2012, Plaintiffs submitted an application to amend their Complaint to add a harassment claim against new defendants.  (Docket entry no. 27).  In particular, the amended Complaint seeks to add the following defendants: Major Burns; Sgt. Susan Smith; SCO L. Hall; SCO McKenzie; an SCO R. Hall.  In support of their amendment, Plaintiffs allege the following facts:  On or about June 19, 2012, defendant SCO McKenzie verbally threatened to harm Plaintiff Thomas.  Plaintiff

28

reported this threat to SCO Hall, who told another correction officer and they both laughed.  Plaintiff alleges that he also reported this latest threat to defendant Adams, who told Plaintiff to document it by filing a grievance.  Plaintiff further alleges that he and Plaintiff Graham are constantly being harassed and threatened by the correction officers at EJSP-STU, and nothing is done to stop it.  Plaintiffs seek to be removed from the EJSP-STU facility and to be compensated for their mental stress, pain and suffering.

Allegations of verbal abuse or threats, unaccompanied by injury or damage, are not cognizable under § 1983, regardless of whether the inmate is a pretrial detainee or sentenced prisoner. See Jean-Laurent v. Wilkerson, 438 F. Supp.2d 318, 324-25 (S.D.N.Y. 2006)(pretrial detainee's claim of verbal abuse not cognizable under § 1983 because verbal intimidation did not rise to the level of a constitutional violation); Ramirez v. Holmes, 921 F. Supp. 204, 210 (S.D.N.Y. 1996)(threats and verbal harassment without physical injury or damage not cognizable in claim filed by sentenced inmate under § 1983).  See also Price v. Lighthart, 2010 WL 1741385 (W.D. Mich. Apr. 28, 2010); Glenn v. Hayman, 2007 WL 894213, *10 (D.N.J. Mar. 21, 2007); Stepney v. Gilliard, 2005 WL 3338370 (D.N.J. Dec. 8, 2005)("[V]erbal harassment and taunting is neither 'sufficiently serious' nor 'an unnecessary and wanton infliction of pain' under the common meaning of those terms. 'Verbal harassment or profanity alone ...

no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under [Section] 1983") (quoting Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998), and citing Collins v. Graham, 377 F. Supp.2d 241, 244 (D.Me. 2005)).  See also Moore v. Morris, 116 Fed. Appx. 203, 205 (10th Cir. 2004)(mere verbal harassment does not give rise to a constitutional violation, even if it is inexcusable and offensive, it does not establish liability under section 1983), cert. denied, 544 U.S. 925 (2005); Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979) (dismissing prisoner's claim that defendant laughed at prisoner and threatened to hang him); Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 187-89 (D.N.J. 1993)); Abuhouran v. Acker, 2005 WL 1532496 (E.D. Pa. June 29, 2005)("It is well established ... that ... verbal harassment, ... standing alone, do[es] not state a constitutional claim")(citing Dewalt v. Carter, 224 F.3d 607, 612 (7th Cir. 1999); Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999); Maclean v. Secor, 876 F. Supp. 695, 698 (E.D.Pa. 1995)).  See also Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (holding that verbal harassment and abuse are not recoverable under § 1983); Patton v. Przybylski, 822 F.2d 697, 700 (7th Cir. 1987)(holding that racially derogatory remarks, although "unprofessional and inexcusable," are not "a deprivation of liberty within the meaning of the due process clause").

Here, Plaintiffs do not allege an accompanying violation that might allow the general verbal harassment to state a separate due process violation or equal protection claim. Moreover, Plaintiffs do not allege any "injury."  Therefore, their allegations of harassment are nothing more than the mere recitation of a legal conclusion without factual allegations sufficient at this time to support a claim that the defendants were verbally harassing Plaintiffs as a form of punishment. Consequently, because the alleged verbal harassment of Plaintiffs are not accompanied by any injurious actions - or physical actions of any kind - by the correction officials named, Plaintiffs fail to state a cognizable § 1983 claim for a violation of their Fourteenth Amendment due process or Fourteenth Amendment equal protection rights, and this amendment will be dismissed accordingly as against all named defendants.

H.   Appointment of Counsel

On or about May 25, 2012, Plaintiff Graham filed an application for appointment of counsel in this matter.  (Docket entry no. 24).  Indigent persons raising civil rights claims have no absolute constitutional right to counsel.  Parham v. Johnson, 126 F.3d 454, 456-57 (3d Cir. 1997).  In determining whether to appoint counsel, a court should consider several factors:

> As a preliminary matter, the plaintiff's claim must have some merit in fact and law. ... If the district court determines that the plaintiff's claim has some merit, then the district court should consider the following factors:

> (1) the plaintiff's ability to present his or her
> own case;
> (2) the complexity of the legal issues;
> (3) the degree to which factual investigation will
> be necessary and the ability of the plaintiff to pursue
> such investigation;
> (4) the amount a case is likely to turn on
> credibility determinations;
> (5) whether the case will require the testimony of
> expert witnesses;
> (6) whether the plaintiff can attain and afford
> counsel on his own behalf.
>
> [Tabron v. Grace, 6 F.3d 147, 155-56, 157 n.5 (3d Cir.
> 1993), cert. denied, 510 U.S. 1196 (1994).]  This list
> of factors is not exhaustive, but instead should serve
> as a guide post for the district courts.
>
> Correspondingly, courts should exercise care in
> appointing counsel because volunteer lawyer time is a
> precious commodity and should not be wasted on
> frivolous cases.  Id. at 157.

Parham, 126 F.3d at 457-58.

Applying these factors to this case, the Court is not

inclined to allow appointment of counsel at this time.

Plaintiff's claims in his Complaint do not involve complex issues

of law or fact, and it is unlikely that there will be a need for

extensive investigation and discovery for plaintiff to prepare

and present his case for trial.  Plaintiff also appears to be

articulate and demonstrates an understanding of the legal issues

and ability to prepare documents and present his case coherently.

Finally, expert testimony is not essential to plaintiff's ability

to present his case, and it is not apparent at this time that the

case will necessarily rest on credibility determinations that

would necessitate appointment of counsel.  Thus, the only factor

weighing in favor of appointment of counsel is Plaintiff's indigency.  Given the balance of factors against appointment of counsel at this time, the Court will deny Plaintiff Graham's application for appointment of counsel without prejudice to him renewing such application at a later time if the circumstance in this case so warrant.

V.  <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' claims alleging failure to protect and use of excessive force in violation of the Fourteenth Amendment will be allowed to proceed at this time as against defendants Ottino, Adams, SCO Cerrone, SCO Nacca, and SCO Castro.  However, the remainder of the Complaint alleging claims of punitive detention, retaliation, sexual harassment and discrimination, and the amended Complaint alleging a harassment claim, will be dismissed without prejudice, in its entirety as against all named defendants, for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Plaintiffs' claims alleging denial of treatment will be dismissed as duplicative and repetitive of their earlier pending actions, <u>Graham v. Corniel, et al.</u>, Civil No. 11-3784 (SRC) and <u>Thomas v. Adams, et al.</u>, Civil No. 10-5026 (DRD).  Finally, Plaintiff Graham's application

33

for appointment of counsel (Docket entry no. 24) will be denied

without prejudice.   An appropriate order follows.


                                           s/ Stanley R. Chesler
                                    STANLEY R. CHESLER
                                    United States District Judge


Dated: October 9, 2012